CLARKSON LAW FIRM
Glenn A. Danas (SBN 270317)
Zarrina Ozari (SBN 334443)
Michael A. Boelter (SBN #353539)
22525 Pacific Coast Highway
Malibu, CA 90265
Telephone: (213) 788-4050
gdanas@clarksonlawfirm.com
zozari@clarksonlawfirm.com
mboelter@clarksonlawfirm.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOLOMON SMITH, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ANTHROPIC, PBC dba ANTHROPIC, INC.<br><br>Defendant. | Case No.: 4:26-cv-07789<br><br>**CLASS ACTION COMPLAINT** |

CLASS ACTION COMPLAINT

Plaintiff Solomon Smith ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class Members"), by and through his attorneys, brings this class action against Anthropic, PBC ("Anthropic") and alleges as follows:

**INTRODUCTION**

1. This action arises from Defendant Anthropic's deceptive marketing and sale of its Claude Max subscription plans. Claude is a generative artificial intelligence product that consumers use to conduct research, draft and edit text, analyze information, and generate computer code, among other tasks. Anthropic charges consumers substantial monthly premiums for its Max plans by promising dramatically increased usage—up to twenty times the usage available under its lowest-priced Pro plan—while delivering materially less than those representations convey.

2. Anthropic markets its premium plans through specific numerical promises. It represents that the Max 5x plan provides "5x more usage than Pro" and that the Max 20x plan provides "20x more usage than Pro," while charging approximately $100 and $200 per month, respectively.

3. These numerical claims are not incidental marketing language. Anthropic places those claims prominently next to the plans' recurring monthly prices, repeats them throughout its pricing, plan-selection, checkout, and upgrade interfaces, and uses them to induce consumers to purchase, upgrade, and renew substantially more expensive subscriptions.

4. A reasonable consumer would understand "5x more usage than Pro" and "20x more usage than Pro" to mean exactly what those statements say: that the Max plans provide five times and twenty times, respectively, the amount of usable access available under the Pro plan. Anthropic reinforces that understanding by charging approximately five to ten times the price of Pro and presenting the promised usage multiples as the principal justification for those premiums.

5. In reality, the advertised multiples are not fixed or reliably delivered. Anthropic retains and exercises unilateral discretion to alter five-hour session limits, imposes weekly and monthly caps, restricts access to particular models and features, and causes subscribers' usage allowances to deplete more rapidly during periods of high demand. The amount of service a subscriber receives therefore depends on Anthropic's undisclosed capacity constraints and internal

CLASS ACTION COMPLAINT

prioritization decisions—not the objective and proportionate usage multiples represented at the point of sale.

6. Anthropic did not clearly disclose that central qualification before obtaining consumers' billing information. The pricing page displayed only a generalized, vague, visually subordinate statement that "Usage limits apply." A consumer would enter the purchase flow without seeing even that statement. Moreover, following the associated link led to a page offering "best practices" for working around limits, not a disclosure that the advertised multiplier itself was variable or capacity dependent. Indeed, this disclosure is itself deceptive, as it suggests that the user is in control of her capacity, when in fact capacity is limited to factors completely hidden from the user and beyond her control, such as demand from other users.

7. The operative qualification is buried even deeper. In separate support materials accessible only through multiple hyperlinks and additional navigation, Anthropic states that it may restrict usage "in other ways, such as weekly and monthly caps or model and feature usage, at our discretion." That language is not only remote from the point of sale, but still fails to explain that Anthropic may reduce the practical value of its headline 5x and 20x promises when demand increases.

8. Anthropic thus presents precision at the point of sale and preserves discretion after payment. It advertises objective numerical benefits to justify premium prices, while withholding the information consumers would need to understand, evaluate, or verify those claims.

9. Plaintiff and the Class Members suffered economic harm by paying for subscription premiums and, in some instances, additional usage charges for a service worth less than Anthropic represented. Had Anthropic truthfully disclosed the variable, discretionary, and capacity-dependent nature of the plans, reasonable consumers would not have purchased or renewed the same plans, would have selected less expensive plans, or would have paid less.

10. Plaintiff seeks damages, including compensatory damages, restitution, declaratory and injunctive relief, attorneys' fees and costs, and all other appropriate relief. The requested injunction would prohibit unsubstantiated numerical usage claims and require Anthropic to disclose, clearly and before purchase, the objective units, material caps, reset periods, and capacity-dependent

3

CLASS ACTION COMPLAINT

restrictions that determine the amount of service consumers actually receive.

**THE PARTIES**

11.    Plaintiff Solomon Smith is an individual and citizen of California residing in San Bernardino County. Plaintiff is a computer-science student at California State University, San Bernardino, and purchased Claude subscriptions primarily for personal, family, or household purposes, including coursework, personal coding projects, and hackathon work.

12.    Defendant Anthropic is a Delaware corporation with its principal place of business in San Francisco, California. Anthropic develops, markets, sells, administers, and controls Claude, its subscription tiers, its usage-accounting systems, and the challenged purchase, upgrade, and renewal interfaces.

**JURISDICTION AND VENUE**

13.    This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The proposed Class exceeds 100 members; the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and, on information and belief, at least one Class member is a citizen of a state other than Delaware or California, while Anthropic is a citizen of Delaware and California.

14.    This Court has personal jurisdiction over Anthropic because Anthropic is headquartered in California, purposefully markets and sells recurring subscriptions to California consumers, and directed or implemented the challenged marketing, pricing, product-design, disclosure, and usage-management practices from California.

15.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant resides in this District and because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred here and continues to occur here.

**FACTUAL BACKGROUND**

**A. Anthropic Sells Usage as the Defining Feature of Its Paid Plans**

16.    Anthropic was founded in 2021 by former OpenAI researchers. Anthropic quickly became one of the most valuable private artificial intelligence companies in the world. Anthropic's annualized run-rate revenue grew from roughly $1 billion at the end of 2024 to more than $47 billion

4

by mid-2026.[1] The company has prepared for a historic initial public offering ("IPO") at a private valuation of approximately $965 billion.[2]

17.    As Anthropic and its Claude product gained immense popularity, with usage growing eightyfold in the first quarter of 2026, Anthropic's infrastructure came under pressure. The increased usage strained Anthropic's output capacity capabilities, which mattered because Claude access was not sold to consumers as a fixed, transparent quantity of compute, but through paid plans governed by usage limits Anthropic controlled.

18.    Anthropic launched Claude in approximately March 2023, began offering individual Pro subscriptions in approximately September 2023, and launched individual Max subscriptions in approximately April 2025.

19.    Anthropic offers Free, Pro, Max 5x and Max 20x plans. During the relevant period, Pro cost approximately $17 per month when billed annually or $20 when billed monthly; Max 5x cost approximately $100 per month; and Max 20x cost approximately $200 per month.

20.    The principal distinction Anthropic drew among the individual paid tiers was the amount of "usage" each plan purportedly provided. The Pro plan promised "more usage" than the Free plan, while the Max plans promised either "5x more usage than Pro" or "20x more usage than Pro."

21.    Anthropic used those purported increases in usage to induce consumers to purchase increasingly expensive subscriptions. The main promise of its premium plan is that consumers who paid more would receive proportionally more access —more usage, more capacity, more productivity, and the ability to complete more work before reaching Anthropic's usage limits.

22.    Consumers do not pay for artificial intelligence in the abstract. They pay to accomplish something concrete: write a report, build an application, analyze a dataset, complete a coding project, or ship working software. The tokens consumed along the way are only the means.

---

[1] *Anthropic Raises $65B in Series H Funding at $965B Post-Money Valuation*, Anthropic (May 28, 2026), https://www.anthropic.com/news/series-h.

[2] *Id.*

CLASS ACTION COMPLAINT

The result is the thing being purchased. Anthropic marketed Claude around those outcomes.

23.    For example, Anthropic described Claude Code as an "agentic coding system" capable of reading a codebase, modifying multiple files, running tests, and delivering committed code. Anthropic encouraged consumers to describe what they wanted to build, test, revise, iterate, or ship, and promised that "Claude Code handles the rest."[3]



_____

[3] Anthropic, Claude Code, available at https://www.anthropic.com/claude-code (last visited June 17, 2026)

CLASS ACTION COMPLAINT

24.     Anthropic similarly represented that its Projects feature could facilitate idea generation, strategic decision-making, and exceptional results.[4]



**ANTHROP\C**    Research   Policy   Commitments ⌄   Learn ⌄   News    Try Claude ⌄

Product

# Collaborate with Claude on Projects

Jun 25, 2024

Our vision for Claude has always been to create AI systems that work alongside people and meaningfully enhance their workflows. As a step in this direction, Claude.ai Pro and Team users can now organize their chats into Projects, bringing together curated sets of knowledge and chat activity in one place—with the ability to make their best chats with Claude viewable by teammates. With this new functionality, Claude can enable idea generation, more strategic decision-making, and exceptional results.

---

[4]   Anthropic, Collaborate with Claude on Projects (June 25, 2024), available at https://www.anthropic.com/news/projects (last visited on June 17, 2026)

CLASS ACTION COMPLAINT

25. Its company page summarized the broader product promise in a single line: "Making AI systems you can rely on.[5]

[5] Anthropic, Company, available at https://www.anthropic.com/company (last visited June 17, 2026)

8

CLASS ACTION COMPLAINT

26.     In marketing its premium plans, Anthropic promised quantifiably more access. Anthropic's "Pro" subscription offered "More usage."  The "Max" subscription offered "5x more usage than Pro" or "20x more usage than Pro" for different costs. Anthropic repeated those representations on its pricing page, in plan-comparison materials, in product announcements, in advertising, and in upgrade prompts shown when users ran out of access.[6] A reasonable consumer would understand those statements to mean that paying more bought a defined, measurable, and proportionally greater amount of working capacity.



---

[6] Anthropic pricing page, available at https://claude.com/pricing (last visited July 27, 2026)

CLASS ACTION COMPLAINT

**B. Anthropic Did Not Clearly Disclose That Usage was Variable and Discretionary**

27.     Anthropic did not disclose at the point of sale the baseline, unit, denominator, or methodology used to calculate "5x" or "20x more usage." It did not state whether the multipliers applied to messages, tokens, hours, five-hour sessions, weekly caps, monthly caps, particular models, or some combination of those measures.

28.     Nor did Anthropic provide subscribers with a meaningful mechanism to verify the advertised multiples. Subscribers could see percentages of certain limits consumed, but could not independently measure their total allocation, compare it with the operative Pro baseline, or determine whether the Max tiers delivered the represented relative capacity.

29.     The only qualification visible on the pricing page was a generalized footnote stating that "Usage limits apply." The footnote was visually subordinate to the headline plan descriptions and prices, and its language disclosed only that some limit existed. It did not disclose that the advertised multiplier itself could change depending on system demand or Anthropic's internal decisions.

30.     The disclosure was also deliberately placed so as to obscure it. A consumer could select a plan and initiate the purchase flow without scrolling to the footnote. The plan-selection and checkout pages collected or confirmed billing information without clearly stating that the numerical multipliers were variable or subject to discretionary capacity-based throttling.

31.     Clicking the "Usage limits apply" hyperlink led to a page titled "Usage Limit Best Practices." Rather than define or clarify the promised quantity, the page focused on tips for working around or conserving limits. However, it did not clearly disclose that the advertised 5x or 20x multiplier was capacity-dependent or subject to reduction at Anthropic's discretion.

32.     The only language that even hinted at such a disclosure appeared deeper in a separate support article. In this article, Anthropic stated: "In addition, to manage capacity and ensure fair access to all users, we may limit your usage in other ways, such as weekly and monthly caps or model and feature usage, at our discretion."

33.     That statement was deliberately buried two links away from the pricing page, in the third paragraph of the fourth section of a support article. Even there, Anthropic framed discretionary

2

restrictions as additional limits, not as a qualification that could make the headline 5x and 20x promises unreliable.

34.    Anthropic's Consumer Terms likewise did not clearly state that the advertised usage multiples were variable, capacity-dependent, or subject to discretionary reduction. And the support page titled "How do usage and length limits work?" described limits in mechanical terms without disclosing that the core multipliers could become a moving target.

35.    Anthropic thus separated the precise promise from the material qualification. The 5x and 20x claims appeared prominently where consumers selected and paid for subscriptions, while the discretionary language appeared only through layered navigation outside the sales funnel.

### C. Consumer Complaints and Reporting Put Anthropic on Notice

36.    Subscribers publicly reported that their paid plans reached usage limits far sooner than the advertised multiples led them to expect. Consumers described receiving substantially less than four times the Max 5x capacity after upgrading to Max 20x, exhausting weekly limits within days, and being required to stop work or purchase additional usage.

37.    Public developer discussions also reported that Anthropic changed limits during billing cycles, tested new limits on subscribers, and left consumers to determine whether shortened access resulted from their own settings or from Anthropic's undisclosed changes.

38.    One widely discussed complaint characterized the practice as "changing the product mid billing cycle without telling anyone" and alleged that Anthropic had been "A/B testing new limits" on paying subscribers. The consumer stated that the altered service was not the same product for which subscribers had paid.

39.    Independent technology reporting likewise documented complaints that Anthropic tightened or altered Claude usage limits without adequate warning and that Claude's popularity and compute constraints caused Anthropic to restrict paid users. These reports included coverage by The Stack, TechCrunch, VentureBeat, The Register, and Business Insider, among others.

40.    The volume and specificity of complaints, together with Anthropic's control over subscriber usage records and public acknowledgement of session-limit adjustments, put Anthropic on notice that consumers did not understand the multipliers to be variable and were not receiving

3

CLASS ACTION COMPLAINT

the value conveyed by its marketing.

41.    Despite that notice, Anthropic continued to use numerical usage claims and recurring billing while failing to disclose, in a clear and proximate manner, the objective limits and discretionary conditions that controlled the service delivered.

**D.  Anthropic Diluted the Relative Value of Paid Tiers**

42.    Anthropic sold Pro and Max subscriptions as premium tiers that included benefits unavailable to users of the Free plan. A material part of the paid plans' value was the relative advantage they provided over lower-priced access.

43.    During the proposed Class Period, Anthropic repeatedly modified the Free and paid tiers, without notice to users. On information and belief, features previously marketed as paid or premium benefits were migrated to the Free tier, including some combination of file creation, external connectors, custom skills, memory features, the Artifacts interface, and access to later Sonnet models.

44.    Anthropic did not provide corresponding refunds, credits, price reductions, or proportionate increases in the relative usage and benefits provided to existing Pro and Max subscribers. The changes therefore reduced the relative value of subscriptions during recurring terms and at renewal.

45.    At the same time, Anthropic retained discretion to tighten paid usage limits. The combined effect was to diminish both sides of the premium bargain: formerly exclusive features became free, while the paid usage advantage remained opaque and subject to capacity-based reduction at Anthropic's sole and unfettered discretion.

46.    Anthropic possessed unilateral control over those changes. Its discretion was not exercised in a manner that preserved the fruits of the bargain represented to paying subscribers.

**E.  The Challenged Representations Were Material and Uniform**

47.    The amount of included usage is material to a reasonable consumer selecting and paying for an artificial-intelligence subscription. Usage determines how long and how often the service can be used before interruption or additional charges, and Anthropic used usage as the principal feature distinguishing Free, Pro, Max 5x, and Max 20x.

CLASS ACTION COMPLAINT

48.    The discretionary nature of usage limits is also material. A reasonable consumer would consider it important that Anthropic could reduce practical capacity during peak periods, impose additional weekly or monthly caps, restrict particular models or features, and change limits after payment.

49.    Anthropic made the challenged representations uniformly through standardized webpages, checkout screens, order details, product announcements, and in-app upgrade prompts. The challenged material omissions likewise resulted from centralized decisions concerning what the sales funnel did and did not disclose.

50.    Anthropic intended consumers to rely on those representations. It placed the numerical multipliers and premium-benefit claims next to recurring prices and displayed them at the moment consumers selected, upgraded, or renewed plans.

51.    Reasonable consumers lacked access to the information needed to verify the claims. Anthropic possessed exclusive knowledge of its rate-limiting algorithms, capacity allocation, session and weekly caps, plan ratios, A/B tests, and historical changes to the limits.

**F.  Plaintiff Solomon Smith**

52.    Plaintiff is a computer-science student at California State University, San Bernardino. He used artificial-intelligence coding tools for coursework, coding projects, and hackathon work. In March 2026, Plaintiff used Claude while developing an academic-advising tool for an IBM hackathon.

53.    Beginning on or about March 16, 2026, Plaintiff paid Anthropic approximately $5.00 for prepaid extra usage and subscribed to Claude Pro for approximately $20 per month.

54.    On or about March 21, 2026, Plaintiff reviewed Anthropic's standardized upgrade interface and upgraded to Max 5x for approximately $100 per month. The interface represented that Max 5x provided "5x more usage than Pro" and priority access at high-traffic times.

55.    The 5x representation, the promise of greater productivity, and the promise of priority access were each substantial factors in Plaintiff's decision to upgrade. Plaintiff understood that paying approximately five times the Pro price would provide approximately five times the usable capacity, subject only to disclosed and proportionate limits.

5
CLASS ACTION COMPLAINT

56.    However, after upgrading, Plaintiff encountered usage restrictions that interfered with his ability to continue working on time-sensitive coding projects. Because Anthropic did not disclose objective units or stable plan caps, Plaintiff could not determine in advance how much work he could complete or whether the paid plan delivered the advertised multiple.

57.    Plaintiff was required to ration or postpone usage, alter how he worked, and consider or purchase additional usage to continue projects after the included capacity was exhausted. The interruptions defeated the reliable workflow and productivity Anthropic used to market the paid plan.

58.    Plaintiff paid more than the service was worth as truthfully described. Had Anthropic disclosed that usage was totally variable, could be adjusted during peak hours, and could be further restricted by undisclosed weekly, monthly, model, and feature caps, Plaintiff would not have purchased or renewed the same plan, would have selected a less expensive plan, or would have paid less.

59.    Plaintiff's injury includes the price premium attributable to Anthropic's challenged representations, prepaid or additional usage charges, and the difference between the value promised and the value received.

60.    Plaintiff continues to use or wishes to use Claude and would consider purchasing or renewing a paid plan if Anthropic truthfully disclosed and delivered the included capacity. Because Anthropic controls and may change the limits without objective units or meaningful advance notice, Plaintiff cannot presently rely on the challenged representations and faces a real risk of being deceived again.

## CLASS ALLEGATIONS

61.    Plaintiff brings this action under Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of the following proposed Nationwide Paid Subscriber Class:

> All natural persons in the United States who paid Anthropic for  Max 5x or Max 20x subscription through Claude.com or a Claude application, at any point from April 1, 2025 to the present.

CLASS ACTION COMPLAINT

62. The class definitions may be further defined or amended by additional pleadings, evidentiary hearings, a class certification hearing, and orders of this Court.

63. The Class is so numerous that their individual joinder herein is impracticable. On information and belief, Members of the Class number in the thousands throughout California and the United States. The precise number of Class Members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class Members may be notified of the pendency of this action by mail and/or publication.

64. Common questions of fact and law predominate over questions that may affect individual class Members, including the following:

a. Whether Anthropic represented that paid plans provided materially greater usage and that Max 5x and Max 20x provided five and twenty times Pro usage;

b. Whether actual usage was variable, capacity-dependent, and subject to undisclosed discretionary throttling;

c. Whether the pricing and purchase flow clearly and conspicuously disclosed material limits before obtaining billing information;

d. Whether Anthropic has made false and/or misleading statements of fact or has omitted, and will continue to make false and/or misleading statements or omit material facts, to members of the Class and the public concerning the usage amounts under the Max 5x and 20x plans;

e. If so, whether Anthropic's false and/or misleading statements of fact or concealment of material facts concerning the usage amounts of Max subscription plans were likely to deceive the public;

f. Whether Anthropic engaged in unfair, unlawful, and/or deceptive business practices in selling to Plaintiff and Class Members Max 5x and Max 20x subscriptions that did not provide five and twenty times Pro usage;

g. Whether Anthropic knew or should have known that its representations and omissions were misleading;

h. Whether Anthropic's omissions were material to a reasonable consumer;

7

CLASS ACTION COMPLAINT

i. Whether Defendants' conduct violated California's consumer protection statutes and other laws asserted herein;

j. Whether Plaintiff and Class Members are entitled to damages, including compensatory damages, restitution, declaratory relief, and/or injunctive relief.

65. Plaintiff's claims are typical because he purchased Pro and Max 5x through Anthropic's standardized interface, was exposed to and relied on the same paid-usage and priority-access representations, was subject to the same opaque and discretionary usage-management system, and suffered the same type of economic injury as Class Members.

66. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests antagonistic to Class Members, understands his obligations as a class representative, and has retained counsel experienced in consumer-protection and class-action litigation.

67. Common questions predominate because liability turns on uniform marketing, standardized contracts, centralized plan configurations, common disclosure practices, and Anthropic's internal usage data. Whether Anthropic's net representations were false or misleading can be determined through common proof.

68. Damages and restitution can be calculated using common methodologies, including the difference between the market value of the plans as represented and as delivered, the price premium attributable to the challenged claims, plan-level usage ratios, refunds, feature histories, and additional-usage charges reflected in Anthropic's records.

69. A class action is superior to other available methods for fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for the Class to prosecute their claims individually.

70. The trial and litigation of Plaintiffs' claims are manageable. Individual litigation of the legal and factual issues raised by Defendant's conduct would increase delay and expense to all parties and the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economics of scale, and comprehensive supervision by a single court.

CLASS ACTION COMPLAINT

71. Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and/or corresponding declaratory relief appropriate with respect to the Class as a whole. The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendants.

72. Absent a class action, Defendants will likely retain the benefits of its wrongdoing. Because of the small size of the individual Class Members' claims, few, if any, Class Members could afford to seek legal redress for the wrongs complained about herein. Absent a representative action, the Class will continue to suffer losses and Defendants will be allowed to continue these violations of law and to retain the proceeds of its ill-gotten gains.

### CALIFORNIA LAW APPLIES

73. Anthropic elected to have California law govern all claims and disputes arising out of its sale of individual Claude subscriptions that are subject to this lawsuit. Specifically, Anthropic's Consumer Terms of Service that govern individual Claude subscriptions provide:

> Terms will be governed by, and construed and interpreted in accordance with, the laws of the State of California without giving effect to conflict of law principles. You and Anthropic agree that any disputes arising out of or relating to these Terms will be resolved exclusively in the state or federal courts located in San Francisco, California, and you and Anthropic submit to the personal and exclusive jurisdiction of those courts. By accessing our Services, you waive any claims that may arise under the laws of other jurisdictions.

74. Anthropic drafted the Terms and required consumers to accept them as a condition of purchasing, upgrading, or renewing individual subscriptions. The parties' relationship and the challenged transactions are substantially connected to California.

75. Independent of the choice-of-law clause, California has the most significant relationship to the challenged conduct. Anthropic is headquartered in San Francisco, and decisions concerning plan names, prices, sales interfaces, usage limits, accounting methodology, product modifications, customer communications, and continued use of the challenged claims were made,

CLASS ACTION COMPLAINT

directed, or implemented from California.

76.     California has a strong interest in regulating deceptive and unfair conduct emanating from businesses headquartered within its borders. Applying California law is consistent with the parties' agreement, their justified expectations, and California's materially greater relationship to the challenged conduct.

## CAUSES OF ACTION

### First Cause of Action

**(Violations of the California Unfair Competition Law, Cal. Civ. Code § 17200, *et seq.*)**

77.     Plaintiff repeats, realleges and incorporates by reference the preceding paragraphs in their entirety as if fully set forth herein.

78.     The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Bus. Prof. Code § 17200.

79.     In the course of conducting business, Anthropic committed "unlawful" business practices by, among other things, making the representations and omissions of material facts, as set forth more fully herein, and by violating California Civil Code sections 1572, 1709, 1711, 1770(a)(5), (7), (9), (16), and the common law.

80.     While conducting business, Anthropic committed "unfair" business practices by, among other things, misrepresenting and omitting material facts regarding the services it provided, inducing consumers into paying for Max plans with deceptive usage claims.  There is no societal benefit from such false and misleading representations and omissions, only harm. While Plaintiff and other Class Members were harmed by this conduct, Defendant was unjustly enriched. As a result, Defendant's conduct is "unfair" as it has offended an established public policy. Further, Defendant engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

81.     Plaintiff alleges violations of consumer protection, unfair competition, and truth in advertising laws in California, resulting in harm to consumers. Defendant's acts and omissions also violate and offend the public policy against engaging in false and misleading advertising, unfair competition, and deceptive conduct toward consumers. This conduct constitutes a violation of the

CLASS ACTION COMPLAINT

unfair prong of the UCL. There were reasonably available alternatives to further Defendant's legitimate business interests other than the conduct described herein.

82.     The UCL also prohibits any "fraudulent business act or practice." In the course of conducting business, Defendant committed "fraudulent business act[s] or practices" by, among other things, prominently making the representations (which also constitute advertising within the meaning of UCL) and omissions of material facts, deceiving consumers as to the nature and true cost of the Max subscription plans, as alleged herein.

83.     Defendant's actions, claims, omissions, and misleading statements, as more fully set forth above, were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Anthropic subscription or pay a lesser price. Had Plaintiff and other Class Members known that Anthropic subscription plans do not provide the usage advertised, they would not have purchased plans or would have paid less for the subscription.

84.     Plaintiff and other Class Members were injured and incurred actual damages as a result of Defendant's conduct in that they relied on Defendant's omissions and, as a result, purchased the Max subscription plan from which they did not receive the benefit of their bargain. These injuries are the direct and proximate consequence of Defendant's misconduct and violation of the UCL.

85.     Pursuant to Business & Professions Code sections 17203 and 17205, Plaintiff seeks an injunction prohibiting Defendant from continuing such practices, corrective advertising, restitution, and all other relief this Court deems appropriate.

## Second Cause of Action

**(Violations of California's Consumers Legal Remedies Act, Cal.  Civ. Code § 1750, *et seq.*)**

86.     Plaintiff repeats, realleges and incorporates by reference the preceding paragraphs in their entirety as if fully set forth herein.

87.     Anthropic is a "person," under California Civil Code section 1761(c).

88.     Plaintiff and other Class Members are "consumers," as defined by Civil Code section 1761(d), who purchased a Max subscription plan.

89.     Anthropic's conduct, as described herein, in misrepresenting the characteristics, qualities, and benefits of the Max subscription plan as alleged herein  violates the California

11

CLASS ACTION COMPLAINT

Consumers Legal Remedies Act ("CLRA"), Civil Code section 1750, et seq. Specifically, Anthropic violated the CLRA by engaging in the following practices proscribed by Civil Code section 1770(a):

(a) misrepresenting that goods or services have characteristics, uses, benefits, or quantities that they do not have, by misrepresenting the amount of usage under the Max subscription plans relative to the Pro plan, in violation of Cal. Civil Code § 1770(a)(5);

(b) advertising goods or services with an intent not to sell them as advertised, by misrepresenting the amount of usage under the Max subscription plans relative to the Pro plan, while providing confusing or inconsistent information to consumers, in violation of Cal. Civil Code § 1770(a)(9);

(c) advertising goods or services with an intent not to supply reasonably expectable demand, unless the advertisement discloses a limitation of quantity, by misrepresenting the amount of usage under the Max subscription plans relative to the Pro plan, without disclosing that the offered usage was incorrect under normal conditions, in violation of Cal. Civil Code § 1770(a)(10); and

(d) representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not, by misrepresenting the amount of usage under the Max subscription plans relative to the Pro plan, without disclosing that the offered usage was incorrect under normal conditions, in violation of Cal. Civil Code § 1770(a)(16).

90.    Anthropic knew before the time of sale to Plaintiff and other Class Members that its Max plan subscription does not provide the advertised benefit.

91.    Pursuant to CLRA section 1782(d), Plaintiff, individually and on behalf of other Class Members, seeks a Court order enjoining the above-described wrongful acts and practices of Anthropic.

92.    Anthropic's unfair and deceptive acts or practices were the foreseeable and actual cause of Plaintiff and other Class Members suffering actual damage.

93.    Plaintiff has not yet complied with the notice provision of CLRA section 1782 and therefore does not seek damages on this claim at the time this Complaint is filed.

94.    Plaintiff will notify Anthropic of the particular alleged violations of Cal. Civil Code § 1770 and demand that they correct, repair, replace, or otherwise rectify the goods or services alleged to be in violation of § 1770. The notice will be given in writing and will be sent by certified mail, return receipt requested, to the place where the transaction occurred or to Anthropic's principal places of business within California. This Complaint will be amended to state a claim for damages

CLASS ACTION COMPLAINT

pursuant to Cal. Civil Code § 1782(d) upon the expiration of thirty days after the notice is given.

95. Plaintiff is entitled to an award of attorneys' fees and costs pursuant to Cal. Civil Code § 1780(a)(4).

96. Accordingly, Plaintiff now seeks equitable relief, including injunctive relief to enjoin Anthropic's practices, as well as an award of attorneys' fees and costs pursuant to Cal. Civil Code § 1780, subdivisions (a) and (e).

97. Anthropic's conduct is fraudulent, wanton, and malicious. Filed concurrently with this class action complaint is the declaration of Glenn A. Danas, showing that this action has been commenced in the proper forum pursuant to Civil Code section 1780(d).

<strong><u>Third Cause of Action</u></strong>

<strong>(False Advertising Law, Cal. Bus. & Prof. Code § 17500, <em>et seq.</em>)</strong>

98. Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs in their entirety as if fully set forth herein.

99. Anthropic made and disseminated advertising statements from California and to consumers nationwide to induce purchases and renewals, including that paid plans offered "More usage," Max 5x provided five times Pro usage, Max 20x provided twenty times Pro usage, and paid subscribers would receive priority access and materially fewer interruptions.

100. The statements were untrue or misleading because the plans did not reliably deliver the quantities and benefits conveyed and because Anthropic failed to disclose material limitations that contradicted the advertisements' net impression.

101. Anthropic knew or, through the exercise of reasonable care, should have known the statements were untrue or misleading. Anthropic created the plans, set and adjusted the limits, tracked usage, authored the support materials, and possessed the data necessary to compare the tiers and disclose capacity-dependent restrictions.

102. Plaintiff and Class Members lost money as a result by paying a price premium, paying for subscriptions they otherwise would not have purchased or renewed, and incurring additional usage charges.

103. Plaintiff seeks restitution of money acquired through the false advertising and an

13
CLASS ACTION COMPLAINT

injunction prohibiting Anthropic from using unsubstantiated numerical usage or premium-benefit claims and requiring clear disclosure of the operative units, caps, and conditions.

## Fourth Cause of Action

### (Breach of Contract)

104.    Plaintiff repeats, realleges and incorporates by reference the preceding paragraphs in their entirety as if fully set forth herein.

105.    Plaintiff and Class Members have valid contracts with Anthropic for the acquisition of Claude via monthly subscriptions to the Max 5x and 20x plans.

106.    Plaintiff and Class Members have complied with the terms of the contract by paying $100 or $200 per month in exchange for access to Claude via the Max 5x and Max 20x plans.

107.    Anthropic has breached its contracts with consumers by failing to provide Max subscribers with five and twenty times more usage than it provides to its Pro subscribers per month (or per week, in the alternative), as advertised.

108.    As a direct and proximate result of Anthropic's breach, Plaintiff and Class Members suffered damages in an amount to be proven at trial, including benefit-of-the-bargain damages, overpayments and price premiums, additional-usage charges, and the difference between the value of the usage promised and the value delivered.

## Fifth Cause of Action

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

109.    Plaintiff repeats, realleges and incorporates by reference the preceding paragraphs in their entirety as if fully set forth herein.

110.    Plaintiff and Class Members entered standardized subscription agreements with Anthropic and paid recurring subscription and additional-usage charges.

111.    The agreements conferred discretion on Anthropic concerning capacity management, plan limits, model access, feature availability, and product changes. That discretion directly affected the benefits Plaintiff and Class Members reasonably expected to receive.

112.    The implied covenant required Anthropic to exercise its discretion in good faith and not to frustrate the agreements' purpose or deprive subscribers of the benefits for which they paid.

CLASS ACTION COMPLAINT

113.   Anthropic breached the implied covenant by, among other things, reducing or accelerating depletion of usage based on undisclosed capacity conditions; changing limits during billing cycles without adequate notice; testing materially different limits on paying subscribers; and migrating premium features to lower-priced or free tiers without preserving or compensating the relative value of paid subscriptions.

114.   Those practices were inconsistent with the objectively reasonable expectations created by Anthropic's quantified usage and premium-access representations and deprived subscribers of the fruits of their agreements.

115.   Plaintiff and Class Members were damaged in an amount to be proven, including overpayments, price-premium damages, additional usage charges, and the difference between the subscription value reasonably expected and the value delivered.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests relief against Defendant as set forth below:

a.  entry of an order certifying the proposed Class pursuant to Federal Rule of Civil Procedure 23;

b.  entry of an order appointing Plaintiff as representative of the Class;

c.  entry of an order appointing Plaintiff's counsel as lead counsel for the Class;

d.  entry of an order for injunctive and declaratory relief as described herein;

e.  entry of judgment in favor of each Class member for damages suffered as a result of the conduct alleged herein, statutory damages, punitive damages, restitution, and disgorgement, to include interest and prejudgment interest;

f.  award Plaintiff reasonable attorneys' fees and costs; and

g.  grant such other and further legal and equitable relief as the court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

CLASS ACTION COMPLAINT

DATED: July 27, 2026

Respectfully submitted,

By: /s/ Glenn A. Danas

CLARKSON LAW FIRM
Glenn Danas
Zarrina Ozari
Michael Boelter
22525 Pacific Coast Highway
Malibu, CA 90265
Telephone: (213) 788-4050
gdanas@clarksonlawfirm.com
zozari@clarksonlawfirm.com
mboelter@clarksonlawfirm.com

*Attorneys for Plaintiff Solomon Smith*

CLASS ACTION COMPLAINT